UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| JAMES TUTT, | ) | CASE NO. 1:16CV204 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | GEORGE J. LIMBERT |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | MEMORANDUM OPINION |
| SECURITY ADMINISTRATION, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |


Plaintiff James Tutt ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, filed July 10, 2016, Plaintiff presents three issues for review, namely, whether: (1) the administrative law judge ("ALJ") failed to properly evaluate the opinions of Plaintiff's treating physicians and mental health professional; (2) the ALJ's finding that Plaintiff could perform light work was supported by substantial evidence; and (3) new material evidence warrants remand. ECF Dkt. #13 at 1, 12-25. On September 22, 2016, Defendant filed a response brief. ECF Dkt. #15. Plaintiff did not file a reply brief.

For the following reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.

## I.        FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on December 6, 2011. ECF Dkt. #9 ("Tr.") at 180.[2] In both applications, Plaintiff alleged disability beginning November 30, 2011. *Id.* These

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled.  This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

claims were denied initially and upon reconsideration on October 24, 2012, and March 13, 2013, respectively. *Id.* Plaintiff then requested a hearing before an ALJ, and the hearing was held on April 29, 2014. *Id.*

On August 11, 2014, the ALJ denied Plaintiff's applications for DIB and SSI. Tr. at 177. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. *Id.* at 182. Continuing, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 30, 2011, the alleged onset date. *Id.* The ALJ found that Plaintiff had the following severe impairments: degenerative joint disease of the knees; degenerative disc disease of the lumber spine; obesity; cluster headaches; mood disorder; personality disorder; and polysubstance abuse, in reported remission. *Id.* at 181-82. Following an analysis of Plaintiff's severe impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. *Id.* at 183. After considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) insofar as Plaintiff could lift and/or carry up to twenty pounds occasionally and up to ten pounds frequently, and stand and/or walk for about six hours and sit for about six hours during an eight-hour workday. *Id.* at 186. Additionally, the ALJ imposed the following restrictions: a sit/stand option allowing Plaintiff to alternate positions for five minutes every hour; occasionally balance, bend, stoop, and climb ramps or stairs with handrails; never kneel or crawl; avoid all exposure to hazards, such as unprotected heights and dangerous moving machinery; perform simple, routine, tasks with simple, short instructions; make simple work-related decisions; limited to work with few changes in the routine work setting; cannot perform fast paced or quota-based work; cannot perform work that requires responsibility for the safety of others; and superficial interaction with coworkers, supervisors, and the public. *Id.* at 186-87.

Next, the ALJ found that Plaintiff was unable to perform any past relevant work. Tr. at 196. The ALJ stated that Plaintiff was fifty years old on the alleged disability onset date, and was thus considered an individual closely approaching advanced age. *Id.* Continuing, the ALJ indicated that Plaintiff had at least a high school education, was able to communicate in English, and that the

-2-

transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled. *Id.* at 196-97. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 197. In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from November 30, 2011, through the date of the decision. *Id.* At issue it the decision of the ALJ dated August 11, 2014, which stands as the final decision.

On January 28, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on July 10, 2016, posing the following issues to the Court for consideration:

1. Whether the ALJ failed to properly evaluate the opinions of [Plaintiff's] treating physicians and mental health professional, resulting in a decision prejudicial to the Plaintiff and lacking the support of substantial evidence.

2. Whether the ALJ's finding that [Plaintiff] can perform light work is supported by substantial evidence.

3. Whether material new evidence warrants remand.

ECF Dkt. #13 at 1. Defendant filed a response brief on September 22, 2016. ECF Dkt. #15. Plaintiff did not filed a reply brief.

**II.**    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

After finding that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015, and that he had not engaged in substantial gainful activity since November 30, 2011, the alleged onset date, the ALJ determined that Plaintiff's severe impairments caused more that minimal limitations on his ability to perform basic work activities. Tr. at 183. In addition to the impairments found to be severe, the ALJ explained that the record contained some reports of stomach irritation, esophageal reflux, and a dislocated finger, however, none of these conditions constituted a severe impairment. *Id.* Next the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 183-86. When making the above finding, the ALJ specifically considered Listings 1.02, 1.04, 12.04, 12.07, 12.08, and 12.09,

as well as the "paragraph B" and "paragraph C" criteria, and ultimately determined that Plaintiff did not meet any of these Listings or fulfill the criteria under "paragraph B" or "paragraph C". *Id.* at 184, 186.

The ALJ also considered Plaintiff's activities of daily living, social functioning, and concentration, persistence, or pace. Tr. at 185-86. In activities of daily living, the ALJ found that Plaintiff had mild restrictions, citing Plaintiff's testimony that he: cared for two dogs; had a valid driver's license and was able to use public transportation; and was able to prepare simple meals, wash dishes, wash his laundry, take out the trash, and shop for groceries. *Id.* at 185. Further, the ALJ noted that Plaintiff reported to fraud investigators that he was able to manage all of his personal needs without the assistance of others. *Id.* Regarding social functioning, the ALJ determined that Plaintiff had moderate difficulties, indicating that the record showed that Plaintiff: spent his time alone and did not visit with family or friends; complained of irritability; was able to use public transportation and shop for necessities; and reported having a "nice Thanksgiving" with his family in 2013. *Id.* The ALJ further noted that a consultative examiner, as well as Plaintiff's therapist, described Plaintiff as cooperative. *Id.* Continuing, the ALJ found that Plaintiff had moderate difficulties in concentration, persistence, or pace, stating that the record showed that Plaintiff: complained of problems with memory and concentration; could spell "world" backwards and perform simple mathematical equations; and had no memory deficiencies, according to therapy notes. *Id.* Further, the ALJ indicated that while the foregoing therapy notes detailed Plaintiff's subjective reports of difficulty with attention and concentration, the notes contained no objective findings to substantiate Plaintiff's complaints. *Id.* Continuing, ALJ also indicated that Plaintiff had experienced no episodes of decompensation of extended duration. *Id.*

Next, the ALJ discussed the opinions of the reviewing state agency psychological consultants, Patricia Semmelman, Ph.D., and Karen Terry, Ph.D. Tr. at 185. The ALJ indicated that the state agency psychological consultants found that Plaintiff experienced: no restriction in activities of daily living; mild difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. *Id.* The ALJ concluded that the evidence received at the hearing level showed that

-4-

Plaintiff was more limited than suggested by the state agency psychological consultants, and therefore afforded the opinions of Dr. Semmelman and Dr. Terry little weight.  *Id.* at 185-86.

Continuing, the ALJ discussed the opinion of Mary Lieder, a nurse practitioner and Plaintiff's mental health provider.  Tr. at 186.  The ALJ indicated that Nurse Lieder opined that Plaintiff experienced: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompenation, each of extended duration.  *Id.*  According to the ALJ, Nurse Lieder's opinion suggested that she had little understanding of the "paragraph B" criteria contemplated by the Listings, citing as an example the fact that there was "simply no evidence of any episodes of decompensation of extended duration."  *Id.*  The ALJ stated that, contrary to Nurse Lieder's opinion, at all times relevant to the decision Plaintiff lived in his own home, was able to tend to his personal needs, and underwent treatment that was limited to outpatient care.  *Id.*  Further, the ALJ indicated that while the record showed that Plaintiff experienced some difficulty in social functioning and concentration, persistence, or pace, the objective evidence did not suggest that these difficulties rose to marked levels.  *Id.*  Accordingly, the ALJ afforded little weight to Nurse Lieder's opinion.  *Id.*

After making the above findings, that ALJ determined that Plaintiff possessed the ability to perform light work, with the restrictions detailed above.  Tr. at 186.  When discussing her RFC determination, the ALJ first indicated that Plaintiff alleged disability due to conditions that included headaches, knee pain, and problems with memory, concentration, and comprehension.  *Id.* at 188.  The ALJ also noted that Plaintiff testified that he had difficulty reading, experienced knee and back pain that prevented him from lifting, and used a cane.  *Id.*  Further, the ALJ indicated that Plaintiff acknowledged a history of marijuana and alcohol abuse, but stated he had not used either substance in over a year, and that he could lift about twenty pounds, stand for about fifteen minutes, and sit for about half an hour.  *Id.*  The ALJ also stated that Plaintiff testified that he: was able to prepare simple meals, wash his laundry, take out the trash, and shop for groceries; had a driver's license; and was able to use public transportation.  *Id.*

-5-

Continuing, the ALJ noted that multiple inconsistencies appeared throughout the record. Tr. at 188. First, that ALJ indicated that although the record showed recent allegations of illiteracy, Plaintiff reported in multiple Disability Reports that he could read and write more than his name, and that Plaintiff's reading level, while low at a 3.6 grade level, was far from illiterate. *Id.* Next, the ALJ stated that a prior Field Office report indicated that Plaintiff had "no difficulty reading or understanding." *Id.* Further, the ALJ indicated that Plaintiff reported to fraud investigators that he occasionally used a computer to look up information, and, moreover, "after much prodding," admitted during the hearing that he completed his own pain questionnaire and work history report. *Id.* The ALJ also indicated that Plaintiff reported to his therapist that he had a "nice Thanksgiving" with his family and that records showed that he reported that he enjoyed spending time with his grandchildren, despite having testified that he did not socialize with family or friends. *Id.* After the above discussion, the ALJ stated that although these issues were not dispositive to the determination of disability, they were considered when assessing Plaintiff's credibility. *Id.*

The ALJ continued, stating that a fraud investigation report from September 2012 further diminished Plaintiff's credibility. Tr. at 188. Discussing the report, that ALJ stated that the fraud investigators reported that Plaintiff: did not appear to have any obvious mental or physical impairment; did not appear confused at any time; did not use a cane and did not display any signs of pain or discomfort when descending or ascending the steps of his porch; was clear and concise despite complaints of problems with memory and confusion in the record; was "very pleasant and attentive"; and did not become agitated or uncooperative. *Id.* Further, the ALJ indicated that the fraud report indicated that Plaintiff stated that he: was running his own handy man business; could perform all of his household routines, including cooking, laundry, and bathing without the assistance of others; and occasionally used a computer to look up information, as noted above. *Id.*

After discussing Plaintiff's credibility, the ALJ looked to the medical evidence, ultimately determining that Plaintiff's medical impairments could reasonably be expected to cause the alleged symptoms, however, his statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. Tr. at 188. The ALJ indicated that the record showed that Plaintiff sought emergency treatment in November 2001 for reasons including knee pain that

he reportedly sustained in a fall at work. *Id.* at 189. It was noted by the ALJ that x-rays performed at that time showed some degenerative changes and small effusion, but no evidence of a fracture, and Plaintiff's prescribed treatment included pain medication and a cane. *Id.* Next, the ALJ stated that Plaintiff was evaluated for complaints of headaches and bilateral knee pain in January 2012, and, despite these complaints, Plaintiff was observed to be in no distress. *Id.* The ALJ indicated that although Plaintiff displayed some bilateral knee tenderness, he had a normal gait without any report of cane usage. *Id.* According to the ALJ, Plaintiff received a diagnosis of "likely" cluster headaches, and was prescribed a steroid taper for the headaches and Vicodin for the knee pain. *Id.*

Continuing, the ALJ stated that later in January 2012, Plaintiff's knees were evaluated by James Murphy, M.D., an orthopedic surgeon, who found some tenderness with range of motion and that Plaintiff moved all his extremities normally, and noted mild degenerative change after reviewing Plaintiff's diagnostic imaging. *Id.* The ALJ indicated that Plaintiff also received primary care from a physician's assistant in January 2012 for complaints of back pain and bilateral knee pain. *Id.* According to the ALJ, the physician's assistant noted: decreased range of motion in Plaintiff's knees, without any decrease in strength or sensation; that Plaintiff began experiencing back pain after altering his gait due to knee pain (although it was not clear if this was the physician's assistant's observation or Plaintiff's subjective report); and no significant clinical findings regarding Plaintiff's back. *Id.* The ALJ noted that a chest x-ray performed in January 2012 revealed unspecified multilevel degenerative changes of the spine. *Id.* Further, the ALJ indicated that in February 2012, a nurse practitioner observed Plaintiff using a cane to ambulate, did not otherwise examine Plaintiff, and prescribed neoprene knee braces and Voltaren gel at the appointment. *Id.*

The ALJ then stated that in February 2012, a consultative examiner noted that Plaintiff's self-report of pain did not appear consistent with the results of the examination. Tr. at 189. Specifically, according to the ALJ, the consultative examiner observed that Plaintiff "did not walk in an extremely pained manner." *Id.* Continuing, the ALJ indicated that in February 2012 Plaintiff began treatment with Michael Harris, M.D., who: described Plaintiff's degenerative changes as moderate based on diagnostic imaging; noted some tenderness and crepitus in the knees, right greater than left; made no observation regarding Plaintiff's gait or cane usage; and prescribed medications such as

Celebrex and Percocet, in addition to a course of physical therapy. *Id.* The ALJ stated that Plaintiff was referred for physical therapy in June 2012, and that upon referral Plaintiff reported that he fractured his right knee when he fell in November 2011, despite prior diagnostic imaging having shown no evidence of fracture. *Id.* Further, the ALJ noted that Plaintiff reported using a cane for balance, but only when he left the house, that he became tired, and that he could drive and was independent with personal care tasks. *Id.* The ALJ stated that a physical examination showed that Plaintiff's gross strength and range of motion "seemed to be within functional limits, but his endurance and balance were impaired." *Id.* at 189-90. Continuing, the ALJ indicated that Plaintiff was observed to have an antalgic gait, however, the therapist noted that Plaintiff "was walking with the cane on the wrong side." *Id.* at 190. The ALJ noted that Plaintiff admitted at the hearing that he could read, but he reported that he was illiterate to the physical therapist. *Id.* Additionally, the ALJ stated that Plaintiff stopped attending physical therapy after only three sessions. *Id.*

The ALJ indicated that medical evidence from July 2012 shows that Plaintiff received primary care for complaints of headaches and knee pain, and was given a steroid taper for the headaches; however, the ALJ stated that Plaintiff was denied requested narcotic pain relievers because he was already receiving narcotic pain relievers from a different doctor. Tr. at 190. Continuing, the ALJ noted that Plaintiff returned to Dr. Harris in August 2013 for a follow-up appointment regarding his knee pain, and Dr. Harris' clinical findings were largely similar to his previous examinations. *Id.*

Next, the ALJ discussed, at length, the aforementioned September 2012 fraud investigation conducted against Plaintiff. Tr. at 190. The ALJ indicated that Plaintiff was unwittingly interviewed by two detectives investigating allegations of fraud on behalf of the Ohio Disability Determination Service. *Id.* Continuing, the ALJ noted that during the interview Plaintiff: presented without any apparent physical or mental impairments; displayed no signs of pain or discomfort when ascending or descending his porch steps; and indicated he was able to manage all of his personal needs without the assistance of others. *Id.* Additionally, the ALJ explained that during the interview Plaintiff reported operating a handy man business and, upon being asked about the business, gestured towards a van across the street that advertised services including general labor, light

-8-

hauling, and demolition.  *Id.*  The ALJ opined that the observations contained in this report reveal a functional capacity far above that alleged by Plaintiff, and that there was nothing in the report to suggest that Plaintiff was unable to work in accordance with the assessed RFC determination.  *Id.*

After discussing the fraud report, the ALJ indicated that a March 2013 progress note prepared by Dr. Harris showed a complaint of back pain with a duration of only four days.  Tr. at 190.  The ALJ noted that Plaintiff reported that he exacerbated his back while doing housework that included painting and moving furniture, activities that suggested a greater functional capacity than alleged during the hearing.  *Id.*  Additionally, the ALJ stated that the progress notes indicated Plaintiff reported that the Percocet combined with a nonsteroidal anti-inflammatory pain reliever provided good relief, but that he no longer had a prescription for Percocet.  *Id.*  The ALJ stated that a physical examination showed some tenderness to palpation and positive straight leg raises, and that Plaintiff was given a Toradol injection in his right knee.  *Id.*  The ALJ noted that the record shows no significant complaints of back pain since that time, and that in August 2013, Plaintiff reported about ten weeks of relief from the injection in his right knee.  *Id.*

Next, the ALJ stated that Plaintiff sought primary care specifically for his headaches in August 2013, and that this was the first significant report of this condition since July 2012.  Tr. at 191.  The ALJ indicated that Plaintiff reported experiencing worsening headaches for about one month, however he denied any visual disturbances, as well as joint swelling, muscle weakness, or arthritic pain.  *Id.*  Continuing, the ALJ noted that the objective findings from this visit show that Plaintiff's mental status was intact, and that Plaintiff was found to have normal strength, muscle tone, and gait.  *Id.*  The ALJ stated that Plaintiff was diagnosed with a cluster headache and given a steroid taper.  *Id.*  According to the ALJ, an express care progress note from the next month shows that: Plaintiff reported, in spite of his headaches, no weakness, memory loss, fatigue, or gait dysfunction; a physical examination revealed Plaintiff had no motor deficiencies and retained a normal gait; and Plaintiff's back was found to have full range of motion.  *Id.*

The ALJ stated that Plaintiff underwent a neurological evaluation in October 2013, during which Plaintiff reported headaches occurring six to seven times a day for the previous two months. Tr. at 191.  Continuing, the ALJ indicated that Plaintiff denied any musculoskeletal or psychiatric

problems, and reported no neurological deficits beyond the headaches. *Id.* The ALJ noted that Plaintiff was observed to have full motor strength, normal sensation, and normal gait. *Id.* According to the ALJ Plaintiff received a diagnosis of a cluster headache, for which he was given prescriptions for Verapamil, Topamax, and Percocet. *Id.* The ALJ stated that Plaintiff sought emergency care several days after the neurological evaluation, complaining of an intractable headache, for which he was given an Imitrex injection, which provided partial relief. *Id.* As noted by the ALJ, it was recommended that Plaintiff be admitted to the hospital, however, he refused admission. *Id.* The ALJ indicated that a follow-up progress note from November 2013 showed that Plaintiff reported gradually worsening headaches, but the physical examination showed normal strength, sensation, gait, and normal range of motion in Plaintiff's back, and that Fioricet was prescribed. *Id.*

Continuing, the ALJ stated that the record showed that Plaintiff received follow-up care for his headaches "on a handful of occasions." Tr. at 191. The ALJ indicated that while these notes showed complaints of headaches, the notes showed no clinical finding of any neurological defects and Plaintiff's treating neurologist made at least two comments suggesting that his symptoms were not as severe as alleged. *Id.* Additionally, the ALJ cited a December 2013 progress note indicating that Plaintiff was exhibiting drug-seeking behavior. Further, the ALJ points to the most recent progress note, prepared in March 2014, indicating that Plaintiff was "embellishing the pain." *Id.*

The ALJ stated that Plaintiff returned to Dr. Harris for a follow-up appointment regarding his knees, and, although Plaintiff continued to report knee pain, he also continued to perform "odd jobs." Tr. at 191. Continuing, the ALJ indicated that while Dr. Harris noted crepitance when testing the range of motion of Plaintiff's right knee, no obvious effusion was observed and the range of motion was good. *Id.* The ALJ stated that Dr. Harris administered another therapeutic injection, and noted that the records showed limited complaints regarding Plaintiff's right knee since November 2013. *Id.* Further, the ALJ indicated that recent diagnostic imaging showed some mild osteophytic spurring consistent with degenerative disc disease, as well as some joint space narrowing of the knees, right worse than left, but, nevertheless, Plaintiff was observed to have a normal gait as recently as March 2014. *Id.*

-10-

Next, the ALJ stated that although Plaintiff did not specifically allege obesity as an impairment, he had a Body Mass Index that placed him slightly over what was considered obese according to the Clinical Guidelines. Tr. at 192. The ALJ stated that the record showed no consistent findings of gait impairment, routine findings of full strength, and that fraud investigators noted that Plaintiff had no apparent physical impairment and was able to walk up and down the steps to his porch without difficulty. Additionally, the ALJ stated that she considered the exacerbation of Plaintiff's impairments caused by his obesity when making the RFC finding, and determined that his obesity would have little, if any, impact on the other impairments. *Id.*

Regarding Plaintiff's mental impairments, the ALJ indicated that Plaintiff had an admitted history of drug use dating back to the 1980s, and the record showed no evidence of any other significant mental impairments until after Plaintiff's alleged onset date. Tr. at 192. The ALJ noted that although the record showed some subjective complaints of memory problems in January 2012, a progress note from February 2012 showed that Plaintiff denied any psychiatric symptoms, including memory loss, inattention, and depression. *Id.* Continuing, the ALJ indicated that Plaintiff was evaluated by Deborah Koricke, Ph.D., a psychological consultative examiner in February 2012, and that during the evaluation Plaintiff reported: difficulty getting along with others; difficulty functioning due to pain; the ability to perform personal care tasks, clean, and prepare meals, despite daily marijuana use; and no history of inpatient or outpatient mental health treatment. *Id.* The ALJ noted that despite Plaintiff's assertion that he had difficulty getting along with others, Dr. Koricke indicated that Plaintiff was "sufficiently pleasant in his demeanor" during the evaluation. *Id.* Further, the ALJ stated that while Dr. Koricke noted that Plaintiff was a "very poor historian," she could not tell if this was due to a genuine memory issue or if it was intentional. *Id.* The ALJ stated that Plaintiff was able to spell the word "world" forwards and backwards, and solve simple mathematical equations; however, the ALJ also noted that Plaintiff refused to attempt certain tasks, which made it difficult to determine Plaintiff's actual abilities. *Id.* Continuing, the ALJ assessed a diagnosis including: personality disorder; polysubstance abuse, in partial remission; and a global assessment of functioning ("GAF") score of fifty-nine, which was indicative of moderate difficulty in social, occupational, or school functioning. *Id.* The ALJ noted that the GAF score was not

-11-

particularly helpful as it was a snapshot based on a single evaluation, rather than a longitudinal treatment history. *Id.*

The ALJ indicated that one month after his evaluation with Dr. Koricke, during which Plaintiff reported daily marijuana use, Plaintiff reported to Dr. Harris that he stopped using drugs in 1997. Tr. at 192. According to the ALJ, Plaintiff was "very upfront" about his drug history, indicating that he was not using drugs at that time and that he spoke to addicts about addition. *Id.* The ALJ noted that Plaintiff continued to deny and significant psychological symptoms at this time. *Id.*

Next, the ALJ stated that Plaintiff returned to Dr. Koricke in May 2012 for additional testing. Tr. at 193. The ALJ indicated that testing showed an I.Q. of sixty-six, Plaintiff's memory "was less than 99.9% of the population," and that Plaintiff had "very limited" concentration. *Id.* According to the ALJ, Dr. Koricke suggested that these mental deficits were manifestations of Plaintiff's history of drug usage. *Id.* However, the ALJ stated that the record as a whole suggested greater mental functioning than Plaintiff demonstrated during testing with Dr. Koricke and cited: multiple progress notes showing no evidence of psychological impairment; the fraud investigation showing that Plaintiff had no obvious mental impairments, during which Plaintiff did not appear to be nervous or confused at any time; Plaintiff's discussion of his handy man business and statements indicating that he rented apartment space to tenants to help pay his mortgage; the fact that Plaintiff did not appear to be in any discomfort, and was "very pleasant" and attentive when questioned by the fraud investigators; Plaintiff's indication that he was able to manage all of his personal needs without the assistance of others; and his occasional use of a computer to look up information. *Id.* Accordingly, the ALJ did not find the results of Dr. Koricke's evaluation persuasive. *Id.*

The ALJ indicated that Plaintiff sought emergency treatment for symptoms suggestive of possible depression in December 2012. Tr. at 193. Continuing, the ALJ stated that Plaintiff appeared agitated and upset, and that the attending physician said that she would not see Plaintiff again, instead recommending that he be seen by a male provider. *Id.* The ALJ indicated that a mental health assessment performed a couple of weeks later showed that Plaintiff reported depression, anger, mood swings, and multiple social stressors, but, nevertheless, April Priestly, a

social worker, found that Plaintiff had good recent and remote memory. *Id.* Further, the ALJ noted that Ms. Priestly indicated that Plaintiff was agitated, yet still described Plaintiff as displaying: good insight and judgment; sustained attention and concentration; mood disorder; and a GAF score of sixty-one to seventy, suggestive of some difficulty in social occupation or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.* The ALJ again stated that the GAF score was not a good indicator of an individual's ability to perform basic mental work-related activities. *Id.*

The ALJ indicated that Plaintiff was evaluated by Nurse Lieder in January 2013, and that he reported "up and down moods" and that he was easily irritable, but also indicated that he was still running his home repair business. Tr. at 193. According to the ALJ, Nurse Lieder noted that Plaintiff appeared depressed and easily distracted, however, she found that Plaintiff: was cooperative; had good recent and remote memory; presented with mood disorder; and displayed a GAF score of forty-one to fifty. *Id.* The ALJ stated that Nurse Lieder's own clinical findings did not support the "implied level of symptom severity." *Id.* Continuing, the ALJ indicated that Plaintiff had visited approximately once a month with Nurse Lieder since January 2013 for follow-up appointments regarding his mental impairments, and that Plaintiff subjective complaints largely revolved around financial stressors and difficulties related to his relationships with his daughter and siblings. *Id.* The ALJ stated that Nurse Lieder's mental status examinations routinely noted that Plaintiff was cooperative and without any memory deficits, and that there was no objective evidence to determine the severity of Plaintiff's reports of difficulties related to attention and concentration. *Id.* at 194. According to the ALJ, Nurse Lieder's progress notes showed no clinical findings suggesting that Plaintiff's mental impairments were not accommodated in the RFC finding. *Id.*

Next, the ALJ indicated that although the record showed inconsistent evidence regarding Plaintiff's history of drug use, there was no evidence that his prior drug use was material to the outcome of the ALJ's decision. Tr. at 194. The ALJ then summarized the objective evidence, stating that while the objective evidence was sufficient to establish Plaintiff's medically determinable impairments, there was no objective evidence to suggest that Plaintiff could not work in accordance with the assessed RFC. *Id.* Specifically, the ALJ noted that: despite the fact that

-13-

plaintiff sought extensive treatment for knee pain, diagnostic imaging showing relatively mild degenerative changes and multiple observations of normal gait; while Plaintiff received treatment for cluster headaches, there was no clinical evidence of neurological deficits; there were few complaints and/or clinical findings regarding Plaintiff's degenerative disc disease; although the record showed treatment for mental impairments beginning in December 2012, there were no clinical findings to suggest Plaintiff's mental impairments would prevent him from working in accordance with the assessed RFC; the fraud investigation report resulted in numerous contradictions between Plaintiff's observed abilities and the limitations he alleged; and no treating or examining physician made any clinical findings of functional limitation that were inconsistent with the assessed RFC.  *Id.*

The ALJ then discussed the opinion evidence.  Tr. at 194.  First, the ALJ looked to the opinion of Dr. Koricke.  *Id.*  Continuing, the ALJ stated that Dr. Koricke opined that Plaintiff would have difficulty working with others, and diminished memory and concentration; however, there was no clinical evidence that these limitations precluded Plaintiff from working in accordance with the assessed RFC.  *Id.*  As an example, that ALJ indicated that Plaintiff appeared cooperative on multiple occasions, stating that Dr. Koricke noted that Plaintiff remained pleasant even when asked to perform tests for two hours.  *Id.*  The ALJ also noted that while Dr. Koricke's second evaluation indicated a significant decrease in Plaintiff's mental functioning during the three months since the initial evaluation, the surrounding objective evidence did not reflect increase symptom severity.  *Id.*  Additionally, the ALJ stated that the fraud investigation showed no evidence of any mental impairments, and Plaintiff was noted to be attentive and cooperative, without any confusion, and reported that he was able to manage all of his personal needs without any assistance.  *Id.*  The ALJ indicated that Dr. Koricke's opinion was entitled to some weight insofar as it established Plaintiff's difficulty in social functioning and concentration, persistence, or pace, but was entitled to little weight to the extent the opinion could be considered supportive of a finding of disability.  *Id.* at 194-95.

Next, the ALJ addressed Dr. Harris' opinion, in which he opined disabling limitations.  Tr. at 195.  Specifically, the ALJ indicated that Dr. Harris opined that Plaintiff: needed to lie down or

-14-

recline for about one hour during the workday; required "a few" five to ten minute unscheduled breaks during the day; experienced pain and stress that would frequently interfere with Plaintiff's ability to perform work tasks; and would miss five or more days per month. *Id.* The ALJ stated that the objective evidence did not support the severity of Dr. Harris' prescribed limitations, noting that: while Dr. Harris found some evidence of knee tenderness and crepitance, many examinations in the record showed the Plaintiff retained a normal gait; Plaintiff's prescribed treatment was limited to conservative measures, such as medication, braces, and therapeutic injections; and the record showed that Plaintiff was able to manage all of his personal needs without the assistance of others and operate a business. *Id.* For these reasons, the ALJ found that the opinion of Dr. Harris did not support a finding of disability. *Id.*

Continuing, the ALJ discussed the opinion of Dr. Kunhi Veedu, which indicated that Plaintiff experienced five to six headaches a day and that Plaintiff was unable to work during these headaches. Tr. at 195. Additionally, the ALJ indicates that Dr. Veedu stated that Plaintiff had experienced recurrent headaches for the previous twenty years. *Id.* The ALJ stated that Dr. Veedu's opinion was based largely on Plaintiff subjective complaints, and that the objective evidence did not provide a basis for the opinion. *Id.* In addition, the ALJ indicated that the record showed only infrequent complaints of headaches prior to August 2013, and that Dr. Veedu's own treatment notes showed his concerns regarding drug-seeking behavior and symptom embellishment. *Id.* Further, the ALJ noted that the record showed no clinical evidence of any significant neurological deficit. *Id.* The ALJ indicated that, to the extent Dr. Veedu's opinion was based on Plaintiff's subjective reporting, the record showed Plaintiff to be an unreliable historian. *Id.* For these reasons, the ALJ concluded that Dr. Veedu's opinion was entitled to little weight. *Id.*

The ALJ then addressed the opinion of Nurse Lieder, in which she indicated that Plaintiff's mental abilities were "seriously limited" and "unable to meet competitive standards" in numerous categories relating to social functioning and the ability to perform unskilled, semi-skilled, and skilled work. Tr. at 195. Continuing, the ALJ noted that Nurse Lieder endorsed that Plaintiff had a history of an inability to function outside a highly supportive living arrangement for one or more years. *Id.* The ALJ stated that the record did not support the level of symptom severity opined by

-15-

Nurse Lieder, indicating that multiple notations in the record characterized Plaintiff as pleasant and cooperative, and that the fraud investigation showed no evidence of any mental impairment, instead describing Plaintiff as attentive and without confusion. *Id.* at 195-96. Further, the ALJ noted that Plaintiff said that he ran a small business that included dealing with employees, and indicated that he could manage all of his needs without the assistance of others. *Id.* at 196. Accordingly, the ALJ afforded Nurse Lieder's opinion little weight. *Id.* Additionally, for the reasons described above, the ALJ indicated that she afforded little weight to the opinions of the state agency consulting physicians. *Id.*

Following the discussion of the RFC determination, the ALJ found that Plaintiff was unable to perform any past relevant work, was an individual closely approaching advanced age, had a high school education and was able to communicate in English, and that the transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled. *Id.* at 196-97. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 197. In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from November 30, 2011, through the date of the decision. *Id.*

**III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001)  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon

-17-

the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## V. LAW AND ANALYSIS

### A. Treating Physician Rule

Plaintiff asserts that the ALJ failed to properly evaluate the opinions of his treating physicians and mental health professional, and that this failure resulted in an inaccurate RFC finding. ECF Dkt. #13 at 12. An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the

-18-

reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004).  Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Plaintiff claims that the ALJ erred by not analyzing the opinions of Plaintiff's treating physicians and medical health professional under the treating physician regulation or the secondary regulation requiring an ALJ to identify how much weight should by given to the opinions according to a series of factors, and that this failure was contrary to the Sixth Circuit's opinion in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-77 (6th Cir. 2013).  The test presented in *Gayheart* states that treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record.  *Id.* at 376. Additionally, the Sixth Circuit held that an ALJ should consider six factors if it is determined that the opinion of a treating source is not entitled to controlling weight.  *Id.* at 376.  The factors are the: length of treatment relationship and frequency of examination; nature and extent of the treatment relationship;  supportability of the opinion; consistency of the opinion with the record as a whole; and specialization of the treating source.  20 C.F.R. § 404.1527(d); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009).

### 1.    Dr. Harris' Opinion

Dr. Harris opined that Plaintiff: needed to lie down or recline for about one hour during the workday; required "a few" five to ten minute unscheduled breaks during the day; experienced pain and stress that would frequently interfere with his ability to perform work tasks; and would miss five

or more days per month.  Tr. at 195.  Plaintiff asserts that the ALJ violated both prongs of the treating physician rule, claiming that Dr. Harris' opinion: (1) should have been given controlling weight; and (2) should have been given great weight, if not controlling weight, and the ALJ failed to identify any weight afforded to the opinion.  ECF Dkt. #13 at 14-17.

Plaintiff avers that Dr. Harris' opinion should have been controlling weight because it was supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with other substantial evidence in the record.  *Id.* at 14.  In support of this contention, Plaintiff first agues that "objective evidence exists and treatment was perfectly within medical protocol," stating that Dr. Harris treated Plaintiff with therapy, medication, knee injections, and the prescription of braces and a cane.  *Id.*  Additionally, Plaintiff asserts that his ability to manage his "quite limited needs" did not equate to the ability to perform full-time work.  *Id.* at 14-15.  Alternatively, Plaintiff claims that Dr. Harris' opinion should have been afforded great weight, if not controlling weight, and that the ALJ failed to identify the weight afforded to the opinion.  ECF Dkt. #13 at 15-17.  Plaintiff claims that the ALJ did not properly weigh Dr. Harris' opinion based on the factors described in 20 C.F.R. § 404.1527(d).  *Id.*  Specifically, Plaintiff asserts that the ALJ's reasoning was far too generalized and failed to provide reasons that were sufficiently specific to make clear to any subsequent reviewers the weight afforded to Dr. Harris' opinion and the reason for that weight.  *Id.* at 15-16.  Defendant contends that the ALJ reasonably found that Dr. Harris' opinion was not supported by the objective medical evidence, Plaintiff's conservative treatment history, and/or Plaintiff's ability to manage his day to day needs.  ECF Dkt. #15 at 3.  Further, Defendant asserts that the ALJ did not equate Plaintiff's ability to manage his day to day needs with the ability to perform full-time work, and that the ALJ considered the factors presented in 20 C.F.R. § 404.1527(d).  *Id.*

Plaintiff's arguments are without merit as he cannot satisfy either prong of the test presented in *Gayheart* ((1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record).  *Gayheart*, 710 F.3d at 376.  The ALJ found that the objective evidence did not support the severity of Dr. Harris' opined limitations, indicating that: there was some evidence of

-20-

knee tenderness and crepitance; many examinations showed that Plaintiff retained normal gait; Plaintiff was treated with conservative measures; and the record showed Plaintiff was able to manage his own needs. Tr. at 195. Plaintiff cites to a number of pieces of medical evidence, but provides no explanation of how any of the evidence supports the relatively extreme limitations imposed by Dr. Harris or demonstrates that Dr. Harris' opinion was not inconsistent with the medical evidence. *See* ECF Dkt. #13 at 14.

A review of the medical evidence corroborates the ALJ's decision. The medical evidence presented in this case in no way supports Dr. Harris' opinion that Plaintiff needed to lie down or recline for about one hour during the workday, required "a few" five to ten minute unscheduled breaks during the day, experienced pain and stress that would frequently interfere with Plaintiff's ability to perform work tasks; and would miss five or more days per month. Rather, the medical evidence demonstrates that Plaintiff complained of knee pain and occasional back pain that was treated with conservative treatment. Moreover, the record is replete with evidence giving reason to question the severity of Plaintiff's impairments. For example, Plaintiff was frequently seen walking with normal gait, often without his cane. *See* Tr. at 462, 466, 691, 757, 902. Additionally, Plaintiff's physical therapist noted that Plaintiff presented with a cane, but was using the cane "on the wrong side." *Id.* at 649. In addition to evidence supporting a conclusion that Plaintiff was not as limited as opined by Dr. Harris, Plaintiff has failed to identify a single piece of medical evidence that supports the relatively extreme limitations contained in Dr. Harris' opinion.

As for Plaintiff's ability to care for himself and perform daily activities, Plaintiff claims that the ability to manage his "limited needs" did not equate to the ability to perform full-time work. ECF Dkt. #13 at 14. Plaintiff told fraud investigators that he had no problem handling his day to day needs. Tr. at 378. Specifically, Plaintiff stated that he cooked, did laundry, was able to bathe, feed, and clothe himself, and that he was able to manage all of his personal needs without the assistance of others. *Id.* Moreover, Plaintiff told the fraud investigators that he operated his own handy man business that performed services such as general labor, light hauling, and demolition. *Id.* Plaintiff indicated that he currently worked by himself, but had previously hired at least two people to work for him. *Id.*

-21-

Plaintiff's asserts that his ability to care for himself and perform daily activities did not equate to the ability to perform full-time work, citing two Sixth Circuit cases, *Lorman* and *Rogers*. ECF Dkt. #13 at 14-15 (citing *Lorman v. Comm'r of Soc. Sec.*, 107 F.3d 829, 838 (6th Cir. 2015) ("there is a significant difference between doing minimal self-sustaining household chores and performing work 40 hours a week for 52 weeks per year. [The plaintiff's] ability to perform some activities on a limited basis is not substantial evidence that [his or her] symptoms are not disabling"); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (the minimal daily functions of driving, cleaning an apartment, caring for pets, laundry, reading, exercising, and watching the news are not comparable to typical work activities).  Despite his contention that he could manage his "limited needs," the record demonstrates that Plaintiff could manage a wide range of needs, including all of his daily household routines, all of his personal needs, and his finances.  Tr. at 378-79.  Moreover, Plaintiff stated that he worked as a handy man performing services such general labor, light hauling, and demolition.  *Id.* at 378.  Plaintiff indicated that he owned a red van with the words "Moody's Home Improvement" printed on the side, and that he signed a driver's license application on July 14, 2010, affirming a declaration that he did not have a physical or mental condition that prevented him from exercising reasonable and ordinary control of a motor vehicle. *Id.* at 378-79.  For these reason, the Plaintiff in the instant case can be distinguished from the plaintiff's in the Sixth Circuit cases he cites because Plaintiff performs a wide range of activities, including work activity that appears to involve some degree of manual labor.  Additionally, it should be noted that the question at this stage of the proceeding is whether Dr. Harris' opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and if the opinion is inconsistent with the other substantial evidence in the case record.  Dr. Harris' opinion imposed relatively extreme limitations that, for the forgoing reasons, are unsupported by the evidence presented in the record.  Accordingly, Plaintiff has failed to show that Dr. Harris' opinion was entitled to controlling weight.  *See Gayheart*, 710 F.3d at 376.

Plaintiff also claims that Dr. Harris' opinion should have been given great weight, if not controlling weight, and the ALJ failed to identify any weight afforded to the opinion.  ECF Dkt. #13 at 14-17.  Contrary to Plaintiff's position, the ALJ provided sufficient consideration of the factors

-22-

prescribed in 20 C.F.R. § 404.1527(d).[3]  *See* Tr. at195.  The ALJ considered the length of the treatment relationship and frequency of examinations, as shown by the ALJ's thorough recitation of the medical evidence and opinion evidence, which cites and discusses Plaintiff's treatment under Dr. Harris.  *See* Tr. at 188-95.  Consideration of the nature and extent of the treatment relationship by the ALJ is demonstrated in the same manner.  *Id.*  The ALJ addressed the supportability and consistency of the opinion with the record as a whole, as discussed above, and found that Dr. Harris' opinion was not supported by medical evidence and was inconsistent with the record as a whole. *Id.* at 195.  Finally, the ALJ indicated that Dr. Harris was a pain management specialist, and acted in this capacity when treating Plaintiff, showing that she considered the specialization of the treating source.  *Id.*  Insofar as Plaintiff claims that the ALJ did not specify the weight afforded to Dr. Harris' opinion, any potential error is harmless as it is clear from the ALJ's decision that Dr. Harris' opinion was afforded little or no weight because it was not supported by the record. For the reasons stated above, Plaintiff's assertion that the ALJ violated the treating physician rule when assessing Dr. Harris' opinion is without merit.

### 2.      Dr. Veedu's Opinion

Dr. Veedu, the treating neurologist, opined that Plaintiff experienced five to six headaches a day and that Plaintiff was unable to work during the headaches.  Tr. at 195.  Plaintiff claims that the ALJ erred in giving little weight to the opinion of Dr. Veedu.  ECF Dkt. #13 at 17.  Specifically, Plaintiff argues that the ALJ impermissibly relied on the lack of objective medical evidence when disregarding Dr. Veedu's opinion.  *Id.*  Defendant contends that the ALJ reasonably found that Dr. Veedu's opinion was based largely on Plaintiff subjective complaints since there was no objective findings to support the opinion.  ECF Dkt. #15 at 7.

The ALJ reasonably discounted Dr. Veedu's opinion.  Dr. Veedu indicated that Plaintiff suffered from five to six headaches a day, and that Plaintiff had experienced these headaches for the previous 20 years.  Tr. at 195.  The ALJ reasonable determined that Dr. Veedu's opinion was based

---

[3]The factors are: length of treatment relationship and frequency of examination; nature and extent of the treatment relationship;  supportability of the opinion; consistency of the opinion with the record as a whole; and specialization of the treating source.  20 C.F.R. § 404.1527(d).

-23-

largely on Plaintiff's subjective complaints as the record showed only infrequent complaints of headaches until August 2013. *Id.* Further, the ALJ also noted that Dr. Veedu also stated that he was concerned about Plaintiff exhibiting drug-seeking behavior and symptom embellishment. *Id.* As stated above, the test presented in *Gayheart* states that treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record. *Gayheart*, 710 F.3d at 376. Here, the ALJ correctly determined that Dr. Veedu's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques. Accordingly, Plaintiff has failed to show that Dr. Veedu's opinion was entitled to controlling weight, or that the ALJ impermissibly relied on the lack of objective medical evidence when disregarding Dr. Veedu's opinion. *See* ECF Dkt. #13 at 17. To the contrary, the ALJ properly discounted Dr. Veedu's opinion because of the lack of objective medical evidence. For these reasons, Plaintiff's assertion that the ALJ violated the treating physician rule when assessing Dr. Veedu's opinion is without merit.

### 3.    Nurse Lieder's Opinion

Nurse Lieder opined that Plaintiff's mental abilities were "seriously limited" and "unable to meet competitive standards" in numerous categories relating to social functioning and the ability to perform unskilled, semi-skilled, and skilled work. Tr. at 195. The parties agree that Nurse Lieder falls into the category of "other source," rather than "medical source," under 20 C.F.R. § 404.1513(d). ECF Dkt. #13 at 18, #15 at 7. Plaintiff claims that the ALJ did not consider the following factors when assessing Nurse Lieder's opinion: how long the source has known the individual; how frequency the source has seen the individual; how consistent the opinion of the source was with other evidence; how well the source explains the opinion; and whether the source has a specialty or area of expertise related to the individual's impairment. ECF Dkt. #13 at 18-19 (citing Social Security Ruling 06-03p; *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)). Defendant contends that the ALJ considered Nurse Lieder's opinion and provided good reasons for assigning the opinion little weight, namely, Nurse Lieder's poor understanding of the

-24-

"paragraph B" criteria and inconsistencies between her opinion and the record as a whole.  Tr. at 186, 195-96.

Plaintiff's argument is without merit.  The ALJ discussed Plaintiff's initial visit with Nurse Lieder and the subsequent follow-up visits, as well as the opinion issued by Nurse Lieder.  Tr. at 193-95.  Accordingly, the ALJ considered how long Nurse Lieder had known Plaintiff and how frequently he had visited for treatment.  The ALJ also addressed how consistent Nurse Lieder's opinion was with other evidence, stating that the record did not support the opined level of symptom severity based on: multiple notations characterizing Plaintiff as pleasant and cooperative; the fraud investigation report indicating that Plaintiff showed no evidence of any mental impairment or confusion; Plaintiff's indication that he ran a small business and dealt with employees; and Plaintiff's statement that he could manage his personal needs without the assistance of others.  *Id.* Additionally, the ALJ considered how well Nurse Lieder explained her opinion, indicating that she incorrectly endorsed that Plaintiff had a history of inability to function outside a highly supportive living arrangement for one or more years.  *Id.*  Finally, the ALJ noted that Nurse Lieder had a specialty or area of expertise related to Plaintiff's impairment, indicating that she was a nurse practitioner and Plaintiff's mental health provider.  *Id.*  Despite Plaintiff's contention that the ALJ did not consider the above factors when assessing Nurse Lieder's opinion, a review of the decision shows that the ALJ sufficiently considered each factor.  For the above stated reasons, Plaintiff's assertion that the ALJ violated the treating physician rule when assessing Nurse Lieder's opinion is without merit.

### B.      Substantial Evidence

Plaintiff also asserts that the ALJ's determination that Plaintiff could perform a range of light work was in error and was not supported by substantial evidence.  ECF Dkt. #13 at 19-22.  Specifically, Plaintiff asserts that his use of a cane and bilateral knee braces were not adequately evaluated by the ALJ when she made her RFC determination.  *Id.* at 19-20.  Plaintiff claims that the evidence in this case establishes that Plaintiff's cane was medically necessary, and thus it should have been considered in the RFC determination and included in the hypothetical question posed to the vocational expert ("VE").  ECF Dkt. #13 at 22.  Continuing, Plaintiff recognized that the ALJ

was only required to pose to the VE limitations found to be credible.  *Id.* at 21.  Plaintiff then states that the ALJ was required to either include the use of a cane in the hypothetical questions posed to the VE, or to explain his reasons for not including the such a limitation, and her failure to do so constitutes reversible error.  *Id.* at 21-22.  Defendant contends that the ALJ reasonably found that Plaintiff did not require the cane when assessing his RFC.  ECF Dkt. #15 at 13.

Plaintiff's argument is without merit.  As an initial matter, the ALJ cites to numerous inconsistencies when assessing Plaintiff's credibility, including inconsistencies regarding: allegations of illiteracy; self-completion of his pain questionnaire and work history report; socialization with family and friends; and the fraud investigation during which Plaintiff did not display any obvious mental or physical impairment, was not using a cane, did not display any signs of pain or discomfort while descending or ascending the steps of his porch, indicated that he was working as a handy man at the time, and stated that he could perform all of his household routines without the assistance of others.  Tr. at 188.  Moreover, the record is replete with evidence giving reason to question the credibility of Plaintiff's claim that he requires a cane to ambulate, as discussed above.  In addition to Plaintiff displaying no problem walking without a cane when speaking to the fraud investigators, Plaintiff was frequently seen walking with normal gait, often without his cane.  *See* Tr. at 462, 466, 691, 757, 902.  The ALJ repeatedly addressed the inconsistency of Plaintiff's cane use, as well as the findings showing normal gait throughout her discussion of the medical evidence and opinion evidence.  *See* Tr. at 188-96.  Based on Plaintiff's diminished credibility, the medical evidence, and the opinion evidence, it was reasonable for the ALJ to conclude that Plaintiff did not require the cane accommodation, and thus she was not required to include the use of a cane in her RFC finding or the question posed to the VE.  For these reasons, the ALJ's finding that Plaintiff could perform a limited range of light work is supported by substantial evidence, and Plaintiff's argument is without merit.

### C.  New and Material Evidence

Finally, Plaintiff asserts that new evidence, supplied by his treating sources, directly addresses his functional capacity and would lead to a different RFC determination.  ECF Dkt. #13 at 22.  The new evidence to which Plaintiff refers consists of the following:

-26-

1.    A treatment note from Dr. Harris dated October 2, 2014.

2.    An updated mental functional capacity report provided by Nurse Lieder on February 6, 2015.

3.    An MRI of Plaintiff's right knee taken on July 13, 2015.

ECF Dkt. #13 at 22-23.

All of the allegedly new and material evidence provided by Plaintiff post-dates the ALJ's decision, which was issued on August 11, 2014.  Tr. at 177.  This court is confined to review evidence that was available to the ALJ and to determine whether the decision of the ALJ was supported by substantial evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003). The Sixth Circuit has held that "evidence of a subsequent deterioration or change in condition after the administrative condition is deemed immaterial."  *Id.*  Further, Plaintiff has failed to established that the new evidence is material.  The new evidence offered by Dr. Harris and Nurse Lieder appears, from Plaintiff's description, to be similar to the opinions timely offered and considered by the ALJ.  *See* ECF Dkt. #13 at 22.  The MRI was taken nearly a year after the ALJ's decision, and Plaintiff has failed to demonstrate why evidence from July 2015 constitutes reason to remand the ALJ's August 2014 decision.  *See Jones*, 336 F.3d at 478.  Accordingly, Plaintiff has not shown that these newly submitted pieces of evidence warrant this case being remanded.

## VI.    CONCLUSION

For the following reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.

Date: January 31, 2017                          */s/George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE

-27-